UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:       (IN CHAMBERS) - CLAIM CONSTRUCTION ORDER**

## I.      INTRODUCTION

This claim construction opinion construes the disputed terms in U.S. Patent Nos. 6,000,608 ("the '608 patent") and 6,189,787 ("the '787 patent"). On June 12, 2015, plaintiff Alexsam, Inc. ("Alexsam") initiated this action in Los Angeles County Superior Court against defendants Green Dot Corporation ("Green Dot"), Next Estate Communications, Inc. ("Next Estate"), and Does 1 through 10 (collectively, "defendants"). Dkt. 1-1. Alexsam's complaint asserts claims against defendants for: (1) breach of contract; (2) declaratory judgment; and (3) accounting. Id. On July 29, 2015, defendants removed the case to the United States District Court for the Central District of California, citing federal question jurisdiction as the basis for removal. Dkt. 1.

This dispute arises out of a patent infringement suit brought by Alexsam against Next Estate before the Hon. T. John Ward, United States District Judge for the Eastern District of Texas, in late 2003 ("Texas Litigation"). That action resulted in a settlement agreement in which Alexsam agreed to grant Next Estate a license to use its patents in exchange for royalty payments. In the instant action, Alexsam alleges that defendants have breached the terms of the settlement agreement by failing to pay royalties to Alexsam as required by the parties' agreement. In their cross-complaint, defendants contend, inter alia, that Alexsam's patents are invalid and thus that defendants should not be held liable for any purported breach of the settlement agreement.

On August 25, 2015, Alexsam moved to remand the case, asserting that its complaint only asserts claims relating to breach of contract, and therefore does not invoke federal subject matter jurisdiction. Dkt. 29. On September 28, 2015, the Court denied

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

Alexsam's motion, holding that the complaint raised a federal question because "any determination of whether the Agreement was breached will require the Court to interpret the '608 and 787 patents to determine if defendants' products in fact infringe on the patents." Dkt. 40 at 6.

    The parties originally submitted thirty terms for construction, fourteen of which have subsequently been agreed to between the parties. On April 29, 2016, Alexsam filed an Opening Claim Construction Brief ("Pl.'s Opening") and defendants filed an Opening Claim Construction Brief ("Def.'s Opening"). On May 12, 2016, Alexsam filed a Rebuttal Brief ("Pl.'s Rebuttal") and defendants filed a Rebuttal Brief ("Def.'s Rebuttal"). On May 19, 2016, Alexsam filed a reply to defendants' rebuttal ("Pl.'s Reply"), and defendants filed a reply to Alexsam's rebuttal ("Def.'s Rebuttal").

    On May 18, 2016, defendants filed an Ex Parte Application to Strike Alexsam's undisclosed expert, Alex Cheng. The Court granted defendants' application on May 24, 2016, striking and excluding Cheng's declaration and precluding him from testifying at the claim construction hearing.

    A Markman hearing was held on June 14, 2016. For the reasons stated herein, the Court adopts the construction set forth below.

## II.   OVERVIEW OF THE PATENT

    Alexsam owns two patents, each entitled "Multifunction Card System." The '608 patent issued on December 14, 1999. Dkt. 90-2. The '787 patent issued on February 20, 2001 from a continuation of Application No. 08/891,261, which earlier had resulted in the issuance of the '608 patent. Dkt. 90-3. The '787 patent lists the same inventor and contains the same specification as the '608 patent. Both patents are generally directed to a multifunction card system for activating and recharging accounts associated with various types of cards. The '608 patent contains 66 claims; the '727 patent contains 34 claims.

    The patents seek to fill an alleged gap in the prior art by means of a debit/credit card capable of performing a plurality of functions, such as an electronic gift certificate card, a prepaid phone card, and a loyalty card, all in a real-time secure environment, as well as a processing center that can manage such a multifunction card system. Of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

relevance in the current action, the patents also note that existing loyalty card systems are difficult or impossible to coordinate when the loyalty card issuer does not directly participate in the sale transaction - for example, loyalty programs run by manufacturers whose goods are sold by unrelated retailers. The patents explains that the patented invention satisfies a need for a real-time loyalty card system that allows for such functionality, is easily deployed, can reward customers automatically for their loyalty, and can communicate this loyalty reward to databases outside of a single physical retail location.

According to Alexsam, the patented multifunction card system allows for the activation of a variety of cards with some combination of gift certificate, loyalty program, medical information retrieval, and debit card functionality. The technology described in the patents utilize existing point-of-service ("POS") devices found at retailers, such as card swipe machines, cash registers, or computer terminals. The patented card technology has a magnetic strip, similar to a credit or debit card, with a card number encoded on the strip. The card number includes a bank identification number ("BIN") which the retailer's POS device is able to read.

The claimed novel aspect of the invention is the use of the bank identification number in connection with the card number to take advantage of existing POS devices. At the time of the application, existing POS terminals were pre-programmed to read bank identification numbers associated with card issuing institutions. By incorporating a bank identification number into the card number, the inventor created a system that enabled retailers to incorporate a variety of card functions without modifying or pre-programming their existing POS terminals.

The patent describes the process by which data associated with a transaction is entered in and retrieved from remote databases. For example, the electronic gift certificate card is operated as follows: the system allows a retail clerk to activate the card at the point of sale and route the information to a processing hub which creates an account. When a user makes a purchase using the card, the system routes the data to a processing hub, which compares the purchase price to the balance and, if the balance is sufficient, issues an approval code back to the retailer and decrements the balance. If there is an insufficient balance on the card, the system declines the transaction. According to the patent, similar processes can be used to store and retrieve phone card data, loyalty card data, and other information, such as medical information. The patent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

includes claims describing these functions in isolation, as well as in combination - for example, an electronic gift certificate card that also allows the user to earn and redeem loyalty points.

## III.   LEGAL STANDARD

Claim construction begins with an examination of the intrinsic evidence of record, which includes the patent claims,[1] the specification,[2] and, if in evidence, the prosecution

---

[1] The first source courts turn to in order to define the scope of the invention is "the words of the claims themselves, both asserted and nonasserted." Vitronics, 90 F.3d at 1582. In fact, often, "the most important indicator of meaning" of a disputed claim term "is its usage and context, within the claim itself." Middleton, Inc. v. Minn. Mining & Mfg. Co., 311 F.3d 1384, 1387 (Fed. Cir. 2002). Additionally, claim language cannot be interpreted differently in different claims because claim terms must be interpreted consistently. Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579 (Fed. Cir. 1995).

[2] "When the claim language itself lacks sufficient clarity to ascertain the scope of the claims," the court should turn to the specification. Deering Precision Instruments, LLC v. Vector Distrib. Sys., 347 F.3d 1314, 1322 (Fed. Cir. 2003). Review of the specification is always an important part of claim construction. Phillips v. AWH Corp., 415 F.3d 1303, 1315-17 (Fed. Cir. 2005) (en banc); see also Vitronics, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."); Renishaw PLC v. Marposs Societa Per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (citations omitted)). However, "[a]lthough claims must be read in light of the specification of which they are a part, it is improper to read limitations from the written description into a claim." Tate Access Floors, Inc. v. Maxcess Techs., Inc. 222 F.3d 958, 966 (Fed. Cir. 2000) (citations omitted); see also Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1366 (Fed. Cir. 2000) ("Although the written description may aid in the proper construction of a claim term, limitations, examples, or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

history[3] and prior art.[4]  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582, 1584 (Fed. Cir. 1996); <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005) (en banc); <u>V-Formation, Inc. v. Benetton Group Spa</u>, 401 F.3d 1307, 1310-12 (Fed. Cir. 2005).  Courts also may use extrinsic evidence, for example dictionaries, treatises, and expert or inventor testimony, to resolve ambiguities in the disputed claim terms, but only if the intrinsic evidence does not resolve the ambiguities.[5]  <u>Vitronics</u>, 90 F.3d at 1584; <u>Phillips</u>, 415 F.3d at 1317-18.  Further, technically extrinsic evidence, such as dictionaries, encyclopedias, and technical treatises, may be consulted at any time to help determine the meaning of claim terms.[6]  <u>Vitronics</u>, 90 F.3d at 1584 n.6.  However, all

---

embodiments appearing only there may not be read into the claim.").

[3] The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims [and] is often of critical significance in determining the meaning of the claims."  <u>Vitronics</u>, 90 F.3d at 1582.  In particular, "[t]he prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."  <u>Southwall</u>, 54 F.3d at 1576.

[4] In construing asserted claims, courts may consider "prior art proffered by one of the parties, whether or not cited in the specification or the file history[,] . . . to demonstrate how a disputed term is used by those skilled in the art."  <u>Vitronics</u>, 90 F.3d at 1584; <u>see also</u> <u>In re Cortright</u>, 165 F.3d 1353, 1358 ("Prior art references may be 'indicative of what all those skilled in the art generally believe a certain claim term means . . . .'" (quoting <u>Vitronics</u>, 90 F.3d at 1584)).

[5] "The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  <u>Phillips</u>, 415 F.3d at 1324.

[6] However, in <u>Phillips</u>, the Federal Circuit cautioned that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  <u>Phillips</u>, 415 F.3d at 1321 (holding that a court should not start with a dictionary to determine the plain meaning of a term, and only then

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL            'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

forms of extrinsic evidence are less significant to the meaning of disputed terms.
Phillips, 415 F.3d at 1317-19. All such evidence – both intrinsic and extrinsic – should
be viewed from the perspective of a person of ordinary skill in the relevant art. Markman
v. Westview Instruments Inc., 52 F.3d 967, 979-80 (Fed. Cir. 1995) (en banc), aff'd, 517
U.S. 370 (1996).

Generally, courts begin with a "heavy presumption" that "the terms in the claim are
to be given their ordinary and accustomed meaning." Johnson Worldwide Assocs., Inc.
v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999); see also Gart v. Logitech, Inc., 254
F.3d 1334, 1341 (Fed. Cir. 2001). This ordinary and customary meaning is the meaning a
claim term "would have to a person of ordinary skill in the art at the time of the
invention." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111,
1116 (Fed. Cir. 2004). "In some cases, the ordinary meaning of claim language as
understood by a person of skill in the art may be readily apparent even to lay judges, and
claim construction in such cases involves little more than the application of the widely
accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314.

"An accused infringer may overcome this 'heavy presumption' and narrow a claim
term's ordinary meaning, but he cannot do so simply by pointing to the preferred
embodiment or other structures or steps disclosed in the specification or prosecution
history." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002)
(quoting Johnson Worldwide, 175 F.3d at 989-90); see JVW Enterprises, Inc. v. Interact
Accessories, Inc., 424 F.3d 1324, 1335 (Fed. Cir. 2005) ("We do not import limitations
into claims from examples or embodiments appearing only in a patent's written
description, even when a specification describes very specific embodiments of the
invention or even describes only a single embodiment, unless the specification makes
clear that 'the patentee . . . intends for the claims and the embodiments in the
specification to be strictly coextensive.'" (quoting Phillips, 415 F.3d at 1323)). Rather,
"a court may constrict the meaning of a claim term in at least one of four ways." CCS
Fitness, 288 F.3d at 1366. First, the claim term will not be given its ordinary meaning "if
the patentee has chosen to be his or her own lexicographer by clearly setting forth an
explicit definition for a claim term." Johnson Worldwide, 175 F.3d at 990; see also

turn to the specification in order to determine whether to narrow that meaning in light of
the intrinsic evidence).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1204 (Fed. Cir. 2002) ("Indeed, the intrinsic record may show that the specification uses the words in a manner clearly inconsistent with the ordinary meaning reflected, for example, in a dictionary definition. In such a case, the inconsistent dictionary definition must be rejected."). Second, a claim term will not have its ordinary meaning "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." CCS Fitness, 288 F.3d at 1366-67; see, e.g., Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998); SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343-44 (Fed. Cir. 2001); Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1301 (Fed. Cir. 1999). Third, a claim term will not receive its ordinary meaning "if the term 'chosen by the patentee so deprive[s] the claim of clarity' as to require resort to the other intrinsic evidence for a definite meaning." CCS Fitness, 288 F.3d at 1367 (quoting Johnson Worldwide, 175 F.3d at 990). Fourth, if a claim is phrased in step- or means-plus-function format, a claim term does not cover more than the corresponding structure or step disclosed in the specification, and the equivalents thereto. 35 U.S.C. § 112 ¶ 6; CCS Fitness, 28 F.3d at 1367. With regard to the specification and the prosecution history, if the plain language of the claim is to be narrowed, any disclaimer of a broader construction must be "clear and unmistakable." Cordis Corp. v. Boston Scientific Corp., 561 F.3d 1319, 1329 (Fed. Cir. 2009); Home Diagnostics, Inc. v. Lifescan, Inc., 381 F.3d 1352, 1358 (Fed. Cir. 2004).

Thus, although courts may look to intrinsic and extrinsic evidence, courts "perform this consultation" to determine whether any of the reasons for abandoning the ordinary meaning are applicable. Gart, 254 F.3d at 1341. In the absence of one or more of the circumstances set forth above, courts must follow the general rule that claim terms are to be given their ordinary meaning. Id.; Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp., 309 F.3d 1365, 1370-73 (Fed. Cir. 2002) (holding that nothing in the patent's claim language, specification, or prosecution history contradicted or altered the plain meaning of the unambiguous claim term "mobility" and thus it was error for the district court to construe the claim term at issue not in accordance with its plain meaning).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL            'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|----------|----------------------|------|---------------|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

IV.   DISCUSSION

A.      "Directly or Indirectly"

Defendants do not offer a proposed construction for the term "directly or indirectly," and instead argue that the term "directly or indirectly" is too broad and therefore indefinite under 35 U.S.C. § 112(b). Def.'s Opening at 19. The term appears six times in the '608 patent. See '608 Patent, Claims 32, 34, 50, 53, 55, and 57. Each time the term appears it refers to the process by which data is transmitted from the transaction processor -- the original computer processor receiving data from the POS device -- to the ultimate processing hub, which directs data to the appropriate database. See, e.g., '608 Patent, Claim 32 ("a processing hub receiving directly or indirectly said card data from said transaction processor").

Defendants argue that the term "directly or indirectly" is indefinite because it provides no guidance as to the bounds of the claim. They argue that it is unclear from the language of these claims if, for example, "indirectly" would be broad enough to include the receipt of data that is sent to a separate component or physical location, or even a third party site/platform, before transmission to the hub. Def.'s Opening at 19. Alexsam argues that the term is not indefinite and should be given its plain and ordinary meaning. Pl.'s Opening at 16.

The Court agrees the plain meaning of the term "directly or indirectly" is sufficiently clear that it does not require the Court's construction. A plain reading of the patent claim demonstrates that the inventor intended to patent the systems described in the relevant claims, regardless of how the step of transmitting the data from the transaction processor to the processing hub is accomplished.

To further illustrate the point, although the specification does not use the terms "directly or indirectly," it describes several example methods by which the POS device may connect to the processing hub to carry out the transaction – some of these methods are direct and some are indirect. For example, under Method A, data collected at the POS device is transmitted to the retailer's central processor. In this embodiment, the retailer's central processor is the "transaction processor" referred to in Claim 32. The retailer's processor/transaction processor does not transmit the data directly to the processing hub. Rather, it sends the data to the "bank processor," which sends the data through the debit

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES - GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

network to a "sponsor bank processor," which decrypts the data and sends it to the processing hub. '608 Patent 5:39-6:31; '787 Patent 5:45-6:37. This is one example of indirect transfer.

In contrast, Methods E and F describe embodiments where the POS device or the retailer's central processor are customized such that they can transmit the data directly to the processing hub without first sending the data through a bank processor, debit network, or sponsor bank processor. '608 Patent 6:52-64; '787 Patent 6:58-7:3. These examples demonstrate that there are a number of ways by which data transmitted from a processing hub can arrive at the processing hub. The patent claims unambiguously indicate that the patent is to cover any and all of these methods. The term "directly or indirectly" is not, in itself, indefinite.

Whether or not the claim is indefinite, necessitating a finding of invalidity, is another question – one the defendants have suggested, but that parties have not explicitly raised or fully briefed. See Def. Opening at 19 ("The term 'directly or indirectly' is indefinite"). However, the brunt of defendants' argument appears to be that the claim itself is too broad, and that the inventor should not have been able to include all methods of transmitting the data from the transaction processor to the processing hub within the scope of his patent. To the extent defendants wish to challenge the validity of the claims containing the term "directly or indirectly," such indefiniteness argument is better suited for a motion for summary judgment. The Court is persuaded by the cases indicating that a claim may still be found indefinite, despite a court's construction of its constituent terms. See, e.g., Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1251 (Fed. Cir. 2008) ("The fact that [the patent owner] can articulate a definition supported by the specification, however, does not end the inquiry. Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."); Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1371 (Fed. Cir. 2008) ("In and of itself, a reduction of the meaning of a claim term into words is not dispositive of whether the term is definite. And if reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness.") (citing Halliburton)). In sum, the term "directly or indirectly" is not indefinite. The Court does not address whether the claims in which the term "directly or directly" is contained are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

excessively broad or indefinite; if the parties wish to raise this issue they may do so in a motion for summary judgment.[7]

### B.    "Encoded"

Alexsam asserts that this term should be construed to mean "placed into a code." Pl.'s Opening at 2.  Defendants assert that this term should be construed to mean "encoded on a magnetic strip of a card, or as a bar code on the card." Def.'s Opening at 5.

At the hearing, counsel for Alexam argued that it was inconsistent to limit "loyalty data" to swiping functionality if the definition of "encoded" includes other methods of placing information into code to associate a card with a user's BIN.  As discussed below, the Court remains convinced that its construction limiting "loyalty data" is correct.

Alexam's argument does carry some weight, however, when considering the construction of the term "encoded."  Indeed, if the card must be "swiped" before the loyalty data is transmitted, the BIN must be encoded in a way that is amenable to swiping.  The parties have agreed to the construction of "swiping" used in the Texas Litigation.  In that case, the Eastern District of Texas construed "swiping" to mean "passing or sliding a card through an electronic card reader."  See Pl.'s Opening, Exh. F, Dkt. 90-8 at 13.  The definition of "encoded" should therefore only include that subset of encoding methods that are susceptible to being read by an electronic card reader.

While the construction of the terms "loyalty data" and "swiping" indicate that there should be some limitation on the term "encoded" beyond its plain meaning, the claim language and construction of other terms still do not limit the term "encoded" with "sufficient clarity to ascertain the scope of the claims."  Deering Precision Instruments, LLC, 347 F.3d at 1322.  The Court therefore turns to the specification.  The specification only uses "encoded" to describe the process of encoding a BIN on a magnetic strip or bar

---

[7]At the hearing counsel for Green Dot argued that the Federal Circuit has increasingly permitted parties to raise issues of indefiniteness at the claims construction stage.  Counsel ultimately conceded that the issue might be more properly raised on a motion for summary judgment.  The Court agrees.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL                    'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

code; it does not use the term "encoded" to describe other methods of associating a particular BIN with a particular card.  See '608 Patent, 4:40-46, and '787 Patent, 4:46-52 ("The BIN is encoded on a magnetic strip on each card in the system as a part of the card's identification number. Alternatively or additionally, the BIN and identification number could be encoded as a bar code, embossed on the surface of the card . . . ."); '608 Patent, 5:62-65, and '787 Patent 6:1-4 ("If the card is to have a fixed value, the activation amount could also be encoded on the magnetic strip of the card as part of the card's identification number").

The Court therefore adopts defendants' proposed construction of "encoded" to mean "encoded on a magnetic strip of a card, or as a bar code on the card."


**C.    "Information retrieval card"**

Alexsam contends that this term should be construed to mean "a card that is used to retrieve information" Pl.'s Opening at 12. Alexsam believes this definition is readily understandable based on the plain and ordinary meaning of the term "information retrieval card" and asserts that there is no special meaning attributed to the term in the context of the patent.  Id.

Defendants argue that the term should be construed to mean "a card that is part of the multifunction card system, which allows access and retrieval of information, such as a patient's medical information, from a multitude of remote sources, with such information stored in an information database." Def.'s Opening at 7.  Alexsam argues that defendants' construction includes unnecessary and inappropriate limitations.

The Court first notes that the patents do not contain any requirement that an information retrieval card be "part of [a] multifunction card system."  Although the term "multifunction card system" is found in a number of claims (e.g., '787 Patent, Claim 1 - 13), the only claim where the term "Information Retrieval Card" appears, Claim 31 of the '787 Patent, does not include the term "multifunction card system."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

The contrast between claims explicitly teaching inclusion in a multifunction card system and Claim 31, which does not, indicates that Claim 31 is not intended to be limited to a multifunction card system, and that the card may serve the singular purpose of information retrieval.  See Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc., 450 F.3d 1350, 1354 (Fed. Cir. 2006) ("[T]he doctrine of claim differentiation means that different claims are presumed to be of different scope . . . ."); SRI Int'l v. Matsushita Elec. Corp of Am., 775 F.2d 1107, 1122 (Fed. Cir. 1985)("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement").

Defendants contend that the specification demands a contrary construction.  Cf. Retractable Techls., Inc. v. Becton, Dickinson & Co., 653 F.3d 1296, 1305 (Fed. Cir. 2011)(presumption created by the doctrine of claim differentiation "will be overcome by a contrary construction dictated by the written description or prosecution history," quoting Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1369 (Fed. Cir. 2005)) Defendants cite the portion of the specification that states:

"Finally, the multifunction card system of the present invention is capable of providing an information retrieval card. In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided. Each participating patient's medical information is stored in a record in a medical information database maintained at the processing hub. The record contains the identification number encoded on the patient's card." '608 Patent, 10:8-16; '787 Patent, 10:13-22.

However, this passage does not actually necessitate a contrary construction.  While the specification states that the multifunction card system is capable of providing an information retrieval card, the reverse is not necessarily true.  Nothing in the specification requires that an information retrieval card must be part of a multifunction card system –

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

only that it <u>may</u> be. The Court agrees with Alexsam that defendants' proposed limitation that the card be "part of [a] multifunction card system" is unwarranted.

The Court additionally agrees with Alexsam that the defendants' proposed phrase "such as a patient's medical information" is unnecessary and may be unduly confusing. Further, that very example already forms the basis of dependent claim 33. '608 Patent, Claim 33; '787 Patent, Claim 33 ("a method according to claim 31, wherein said information comprises medical history information").

Defendants' primary argument against Alexsam's construction is that it does not account for the fact that the '787 Patent specifies that information is retrieved from databases at sources remote from the point-of-sale device where the information retrieval card is swiped. Def. Opening at 7 (citing '608 and '787 Patents, Claim 31). They request the court include the phrase "from a multitude of remote sources, with such information stored in an information database," in its construction. <u>Id.</u> However, the definition of "information retrieval card" does not need to include the limitation that the card access remote data, because the only claim in which the term appears already includes that limitation.

Further, while Claim 31 does teach that the retrievable information is remote, it does not teach that such information must be from a "multitude" of sources, nor that the information must be retrieved from an "information database." Rather, this language appears to have been derived from the exemplary embodiment included in the specification of the '787 Patent. '787 Patent 10:16-21. The Court declines to import this limitation when construing the term "information retrieval card." <u>Kraft Foods, Inc. v. Int'l Trading Co.</u>, 203 F.3d 1362, 1366 (Fed. Cir. 2000) ("Although the written description may aid in the proper construction of a claim term, limitations, examples, or embodiments appearing only there may not be read into the claim").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|----------|------------------------|------|----------------|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

The Court finds that none of the limitations defendants seek are appropriate and adopts Alexsam's suggested construction of "information retrieval card" as "a card that is used to retrieve information."

**D.     "Purchase data"**

Alexsam argues that the term should be construed as "data that refers to a purchase." Pl.'s Opening at 14. Defendants argue that the Court should not construe Claim 10 of Patent '787 as its plain and ordinary meaning is sufficiently straightforward, but that in all other claims where the term appears the term is indefinite under 35 U.S.C. § 112(b). Def.'s Opening at 19. Defendants argue that the phrase never appears in the specification, and no guidance is provided as to the scope of the term. Id. For example, defendants contend that "purchase data" could theoretically include sales price, quantity, location, product type, or any such information that could possibly be related to a purchase. Id.

Alexsam's proposed construction does provide a limitation on the scope of the term: it limits the term to "data that refers to a purchase." This term need not be limited further to be definite - the world of information that could relate to a purchase is not as unbounded as defendants suggest. Indeed, defendants may have enumerated most of the possible data points that can arise from a simple retail transaction.

Further, although Claim 10 of '787 contains a restriction on the type of purchase data involved in that particular claim, the Court sees no reason to modify the construction of the term for that one particular claim, as defendants' proposed distinction is built into the language of Claim 10 itself. See '787 Patent, Claim 10 states ("said loyalty data comprising said unique identification number . . . and of purchase data representing the goods and services purchase amount").

For these reasons, the Court adopts Alexsam's construction for all uses of the term "purchase data," construing the term to mean "data that refers to a purchase."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**      'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

### E.      "Loyalty data"

Alexsam argues that the term "loyalty data" should be construed as "information regarding or relating to a loyalty card program." Pl.'s Opening at 13.  Defendants offer a more limiting construction: "data generated when a loyalty card is swiped through an [unmodified existing]/[pre-existing] standard retail point of sale device, comprising the unique identification number of the loyalty card and purchase data representing the purchase amount."[8]  Def. Opening at 10.  The parties essentially disagree on (1) whether "loyalty data" is limited to data associated with a POS device; and (2) whether "loyalty data" is limited to the user's identification number and purchase amount.

The Court construes "loyalty data" to mean "data transmitted when a loyalty card is swiped through an [unmodified existing]/[pre-existing] standard retail point-of-sale device, comprising the unique identification number of the loyalty card and purchase data representing the goods and services purchase amount."  It reaches its conclusion based on the following reasoning.

### 1.      Whether "loyalty data" must be associated with a POS device

Defendants contend that loyalty data, as the term is used in the patents, refers not to <u>any</u> information related to a loyalty program, but rather loyalty program information that is linked to a POS device.  They point to the independent claims in which the term "loyalty data" appears, each of which teach that the loyalty data is transmitted by means of the point-of-sale device.  <u>See</u>, <u>e.g.</u>, '608 Patent, 13:22-26 ("means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the loyalty card and purchase card . . ."); '787 Patent, 14:29-36 (same). Alexsam responds that the patents-in-suit do not contain language that explicitly limits loyalty data to "swipe data."  Nonetheless, every claim describes the receipt of loyalty data after a loyalty card is swiped; a construction of loyalty data that includes this

---

[8]Defendants propose use of the phrase "unmodified existing" in the '608 Patent and "pre-existing" in the '787 Patent.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O' |
|---|---|---|---|
| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

restriction is therefore warranted.

Although defendants' proposed construction includes the limitation that "loyalty data" be associated with a POS device, the Court finds it appropriate to change the word "generated," used in defendants' proposed construction, to "transmitted, as "transmitted" more clearly describes the process taught by the patents. The patent claims do not actually contain the word "generated," going only so far as to describe the fact that data is <u>received</u> upon the swiping of a loyalty card. Further, the patent claims teach that at least a portion of the loyalty data is generated by the retailer manually entering purchase data into the point-of-sale device. <u>See</u>, <u>e.g.</u>, '608 Patent Claim 29. While it is possible that the word "generated" could be interpreted to mean the association of the manually entered purchase data with the user's identification number, the Court finds it clearer to avoid the ambiguity of the term "generated" and base construction of the term "loyalty data" not on when the data is "generated" but on when it is "transmitted." The Court will therefore replace the word "generated" with "transmitted" in defendants' proposed construction.

**2.      Whether "loyalty data" is limited to the user's identification number and purchase amount**

Defendants contend that the construction of the term "loyalty data" should limit "loyalty data" to "(1) the unique identification number of the loyalty card and (2) purchase data representing the purchase amount," pointing to the patent claims to support their construction. The Court notes that the independent claims containing the term "loyalty data" are inherently inconsistent, but ultimately agrees with defendants that such limitations are appropriate.

The plain language of the patent claims is inconsistent. Patent '787 Claim 10 specifies that loyalty data consists of only two data points - the user's identification number and purchase amount. On the other hand, several other claims do not contain this restriction, appearing to define loyalty data more broadly to include, in addition to the user's identification number, any other data that might be considered "purchase data." <u>See</u> '608 Patent Claims 12 and 20;  '787 Patent Claim 17.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|----------|----------------------|------|---------------|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

Although such a distinction may typically raise the presumption of claim differentiation, examination of several dependent claims indicates that the inventor intended for the term "loyalty data" to be given uniform meaning across all claims. Specifically, dependent claims found at the '608 Patent Claims 6, 7, 24, 25, 45, 60, and the '787 Patent Claims 5, 6, 21, 22, 25, and 60, use the word "loyalty data" without any definition or limitation and do not indicate which of the two competing definitions is to be applied.  This suggests that the inventor only intended the term "loyalty data" to have one definition.

The specification potentially suggests that the inventor intended the broader definition of "loyalty data" to apply to all claims.  The specification uses "airline frequent flier miles" as an example of a loyalty program, and explains that in such programs, points may be awarded on a per-mile basis.  '608 Patent 2:22-26; '787 Patent 2:26-31.  In order for Alexsam's patent to encompass airline frequent flier programs, the associated database would require input beyond just the card ID number and purchase amount – it would also require inputs regarding the number of miles flown.  This example embodiment therefore suggests the broader construction of loyalty data – that is, the unique identification number of the loyalty card and purchase data.

Nonetheless, the Court concludes that the narrower construction is the proper one. Applying the broader construction to the '787 Patent Claim 10 would contradict its plain language, which limits loyalty data to a "unique identification number and of purchase data representing the goods and services purchase amount."[9]  Ultimately, it is preferable to apply the narrower construction of loyalty data to the remainder of the claims -- even if this reads out what may be considered an example embodiment -- than to adopt a

---

[9]The Court also notes that while airline frequent flier miles are listed as a readily understandable example of a loyalty program, it is never discussed in the specific context of the patented invention.  It is therefore questionable whether the inventor even intended a airline frequent flier miles database to be an embodiment of his loyalty program system claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

construction that directly contradicts the plain language of one of the relevant claims.[10]

In sum, the Court arrives at the following construction of the term "loyalty data": "data transmitted when a loyalty card is swiped through an [unmodified existing]/[pre-existing] standard retail point-of-sale device, comprising the unique identification number of the loyalty card and purchase data representing the goods and services purchase amount."

## F. "Loyalty points"

Alexsam asserts that this term should be construed to mean "a unit of measurement earned from or relating to a loyalty card program, such as frequent flyer air miles." Pl. Opening at 13. Defendants assert that the term should be construed to mean "[p]oints awarded to a consumer for purchasing product-specific or retailer-specific goods or services, where the consumer's loyalty account is credited at the point of sale with points in real time as a purchase takes place." Def.'s Opening at 11. The parties' disagreement essentially centers on: (1) whether "loyalty points" must be awarded in real-time at the point of service; and (2) whether "loyalty points" are limited to awards for product-specific or retailer-specific goods and services.

The Court adopts a modified version of Alexsam's construction: "a unit of measurement earned from or relating to a loyalty card program." It does so for the following reasons.

---

[10]At the hearing, counsel for Alexam additionally argued that defendants' proposed limitation that loyalty data is only transmitted when a loyalty card is swiped, excluding other entry methods, is not supported by the patent claims or specification. The Court disagrees. Each independent claim describing the process by which loyalty data is generated specifically states that the data is transmitted when the "loyalty card is swiped through the point-of-sale device." See, e.g., '608 Patent, Claims 12, 20, and 29; '787 Patent, Claim 17; see also '787 Patent, Claim 10 (emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

1.    Whether "loyalty points" must be awarded in real-time at the point of service

Defendants cite the specification to support their contention that a central feature of "loyalty points" in the patents-in-suit is that they are awarded in real-time, and reward customers automatically at the point-of-service.  See '608 Patent, 2:44-50, '787 Patent, 2:49-55 ("Therefore, there is a need in the art for a real-time loyalty card system which is easily deployed, and which is capable of providing a product-specific loyalty card as well as a retailer-specific cards. There is also a need for a system which can reward customers automatically for their loyalty and communicate this loyalty reward to databases other than at a retail location"); '608 Patent, 9:40-49, '787 Patent, 9:46-55 ("Points are added to the card at participating retail locations which sell the manufacturer's product(s).  The card is swiped at any retail location, the purchase amount for the manufacturer's product is entered using the PIN pad of the POS device, and the data is transmitted to the processing hub using one of the methods described above. After receiving the data, the processing hub credits the appropriate record in the loyalty card database with a number of points proportional to the purchase price.  The card is transportable to any participating retailer").

Ultimately, defendants' proposed limitations are unnecessary, because to the extent that the invention only involves the immediate addition of loyalty points, such limitation is already included in every claim where the term "loyalty points" appears. The term loyalty points never appears in isolation – rather it appears in every instance as a part of a step-wise process, by which loyalty data is transmitted from a POS device and loyalty points are added to an account corresponding to the loyalty card.  See '608 Patent Claims 12, 20, 28, and 55; '787 Patent Claim 10.[11]  Thus, to the extent the patents are restricted to the "point of sale" or "real time" transactions, those limitations are already present in the claims; including them in the definition of "loyalty points" would be redundant.  The Court opts for the simpler construction, which omits this explanation without affecting

_____

[11]The only exceptions are Patent '608 Claim 31 and Patent '787 Claim 30, which are dependent on independent claims describing such a process.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

the meaning of the relevant claims.

### 2.    Whether "loyalty points" are limited to awards for product-specific or retailer-specific goods and services

Defendants next argue that loyalty points are only awarded for product-specific or retailer-specific goods and services, pointing to the specification in support of their argument.  See '608 Patent, 9:55-61; '787 Patent, 9:61-67 ("Alternatively, the card could be issued by a particular retailer to reward customers for purchases made in the retailer's location(s). The retailer could award points for any purchase within the store, or could target special promotional items. The card would function in a manner similar to the product-specific card. Once again, the customer is rewarded when certain point plateaus are reached").

The Court declines to adopt defendants' construction because it contradicts a preferred embodiment described in the specification, in which loyalty points are awarded based on usage of an Electronic Gift Certificate, "in recognition of purchase or recharges made."  The specification states:

> "In the preferred embodiment of the invention, the retail issuer is also given the capability to award loyalty points to the bearer of the Electronic Gift Certificate card in recognition of purchases or recharges made.  In such a case, the processing hub maintains a separate loyalty card database. When the Electronic Gift Certificate card bearer adds money to the card, or makes a purchase using the card, the system may add a number of points proportional to the purchase price to the card's record in the loyalty card database.  Alternatively points could be awarded based upon the frequency of card usage rather than purchase amounts."  '608 Patent 9:11-22; '787 Patent 9:17-28.

The loyalty points discussed in this preferred embodiment are not awarded based on the cardholder purchasing a particular product or shopping at a particular retailer, but are rather awarded based on the cardholder using a particular method of payment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL            'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

Because defendants' proposed construction excludes a preferred embodiment found in the specification, the Court declines to adopt the limitation defendants propose. Burke, Inc. v. Bruno Indep. Living Aids, Inc., 183 F.3d 1334, 1341 (Fed. Cir. 1999)("The district court's claim interpretation requiring a single plane would exclude the preferred embodiment described in the specification and, thus, cannot be sustained").

In sum, the Court disagrees with the limitations defendants seek to place on the term "loyalty points." On the other hand, the Alexsam's use of an example within the definition of "loyalty points" is unnecessary, confusing, and not dictated by the patent claims.  As such, the Court adopts a modified version of Alexsam's construction.  The term "loyalty points" is to be construed as "a unit of measurement earned from or relating to a loyalty card program."

### G.    "Loyalty card"

Alexsam argues that the term should be construed as meaning "cards used to reward consumers for purchasing goods or services." Pl.'s Opening at 12.  Defendants argue that the term should be construed as a "card used to reward consumers for purchasing product-specific or retailer-specific goods or services, where the consumer's loyalty account is credited at the point of sale with points in real time as a purchase takes place."  Def.'s Opening at 8.  The parties' primary points of contention are (1) whether "loyalty cards" must be product-specific or retailer-specific; (2) whether "loyalty cards" must credit a loyalty account at the point-of-service in real time; and (3) whether a "loyalty card" can only be used to credit a loyalty account with loyalty points.

The Court construes "loyalty card" to mean "a card used to reward consumers, where the information regarding the consumer's loyalty account is transmitted at the point of sale in real time as a purchase takes place."  It does so for the following reasons.

### 1.    Whether "loyalty cards" must be product-specific or retailer-specific

Several limitations that defendants seek to include in the construction of the term "loyalty card" are similar to those proffered for the construction of "loyalty data." The

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES - GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

first involves the restriction of loyalty cards to "product-specific or retailer-specific" goods or services. The claims illustrate that the loyalty card system centers largely around the accumulation and redemption of loyalty points. See, e.g., '787 Patent Claim 17 (describing the loyalty card swiping process as culminating with a processing hub "crediting a loyalty card account in a loyalty card database corresponding to said loyalty card with loyalty points based upon said purchase data"); '608 Patent Claim 31 ("allowing the owner of the loyalty card to redeem loyalty points for an item selected from the group consisting of goods, services, discounts on goods and services, long distance telephone calling time value, and money value"). Because loyalty points are not limited to product-specific or retailer-specific goods or services, as discussed above, the Court declines to place this limit on the term "loyalty card."

> **2.    Whether "loyalty cards" must credit a loyalty account at the point-of-service in real time**

Defendants again request that the Court include the limitation that the loyalty account is credited at the point-of-sale, in real time as a purchase takes place. The Court agrees that the real-time or automatic processing of loyalty data appears to be a central part of the loyalty card invention and does not find such a concept to be unclear or confusing, as Alexsam contends, particularly in light of the plain language of the patent claims and specification. The independent claims where the term "loyalty card" appears refer to the process by which loyalty data is automatically processed and transmitted, from the retail POS device to the database containing the user's loyalty account information. See '787 Patent, 14:22-33 ("A loyalty card system, comprising: at least one loyalty card having a unique identification number encoded on it . . . a bank processing hub computer under bank hub software control and in communication over a banking network with a pre-existing standard retail point-of-sale device for receiving loyalty data when said loyalty card is swiped through said point-of-sale device . . .").

This process is also reflected in the specification. '608 Patent, 9:40; '787 Patent, 9:46-55 ("Points are added to the card at participating retail locations which sell the manufacturer's product(s). The card is swiped at any retail location, the purchase amount

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

for the manufacturer's product is entered using the PIN pad of the POS device, and the data is transmitted to the processing hub using one of the methods described above. After receiving the data, the processing hub credits the appropriate record in the loyalty card database with a number of points proportional to the purchase price. The card is transportable to any participating retailer").

Further, unlike the term "loyalty points," discussed above, the term "loyalty card" appears in some claims without explanation of the process such cards initiate, rendering it non-redundant to include this limitation in the definition of the loyalty card itself. An example appears in claims combining multiple card functionalities, as in the '608 Patent Claim 59. That claim teaches:

> "The multifunction card system of claim 57, wherein said card performs the functions of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card."

It appears from the plain language of Claim 59 that the inventor sought to reference at least some of the basic, common characteristics of each of the single-function loyalty card claims, including the fact that the processing of loyalty data occurs in real time. The Court therefore adopts defendants' proposed limitation regarding the real-time capabilities of the loyalty card.[12]

---

[12]At the hearing, counsel for Alexam argued that adopting defendants' proposed limitation regarding the real-time capabilities of the loyalty card would read out an example contained in the specification. Specifically, counsel argued that this limitation would read out airline frequent flier miles, which he asserted are not credited in real-time but are rather credited some time after the purchase takes place. This information regarding airline miles is not included in the specification or any other intrinsic evidence. Counsel's statement is therefore extrinsic evidence at best – it is likely not even admissible without record evidence. The Court finds it inappropriate to consider counsel's statement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

### 3.    Whether a "loyalty card" can only be used to credit a loyalty account with loyalty points

Finally, defendants argue that the construction of "loyalty card" should include the restriction that upon use of a loyalty card, the associated loyalty account is credited with loyalty points.  The Court disagrees with this limitation.

As discussed above, many of the claims where the term "loyalty card" appear describe a process culminating in the addition of "loyalty points" to the user's loyalty account, or the user's redemption of "loyalty points" for various rewards.  However, the specification indicates that the loyalty card was not intended to be limited to the accrual of loyalty points.  As an alternate embodiment, the specification describes a process  by which "the loyalty data could be used to simultaneously credit other databases of the system. For instance, instead of awarding loyalty points, the system could add value in real time to a record in the phone database at the prepaid phone card issuer hub, thus rewarding the customer with free phone time."  '608 Patent 9:62-67; '787 Patent 10:1-6.  Indeed, this appears to have been the inventor's understood meaning of the claims teaching card systems with combined functionality, which do not specifically indicate that use of a loyalty card must result in the crediting of loyalty points.  See, e.g., Patent '608, Claim 59 ("The multifunction card system of claim 57, wherein said card performs the functions of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card").  Because it appears that the loyalty card may be used in some instances to credit accounts in other forms of "currency," the Court declines to read this restriction into the term "loyalty card."  Additionally, because the patents contemplate not only the accrual of loyalty points, but also the redemption of loyalty points, see '608 Patent, Claim 31; '787 Patent, Claim 30, the Court concludes that the definition of "loyalty cards" should not be limited to the ability to credit a user's loyalty account.

In sum, the Court interprets the term "loyalty card" to mean "a card used to reward consumers, where the information regarding the consumer's loyalty account is transmitted at the point of sale in real time as a purchase takes place."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL          'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

### H.    "Entering" and "unique identification number"

Alexsam argues that the term "entering" need not be construed by the Court.  Pl.'s Opening at 11.  Defendants argue that the term should be construed as "entering information on the PIN pad of a pre-existing standard retail point of sale device."  Def.'s Opening at 6.

Alexsam argues that the term "unique identification number" should not be construed by the Court, but, in the alternative, offers the construction: "a one of a kind identification number."  Pl.'s Opening at 3.  Defendants offer a number of constructions of the term, adding additional restrictions to the term's definition according to context. See Def.'s Opening at 15.

The Court finds that the meaning of both terms would be sufficiently apparent to a jury, and that the terms do not require the Courts' construction.  See Advanced Therman Scis. Corp. v. Applied Materials, Inc., No. SACV 07-1384 JVSJWJX, 2009 WL 3784595, at *3 (C.D. Cal. Aug. 3, 2009)("The Court finds that the plain meaning of the term 'process' is sufficiently clear and therefore declines to parse out a more extended definition"); Toshiba Corp. v. Hynix Semiconductor, Inc., No. C-04-4708 VRW, 2006 WL 2432288, at *13 (N.D. Cal. Aug. 21, 2006)("[T]he disclosed embodiments and the ordinary and plain meaning of 'substantially' should be sufficient to guide a jury in performing its duties. If necessary, and if the parties marshal any new intrinsic evidence, the court would consider revisiting this issue at a later date. But for present purposes, the court rejects Hynix's construction and declines to construe this term").

### I.    Means-plus-function claims

Finally, defendants seek the "construction" of a number of alleged means-plus-function claims.  Def.'s Opening at 16-21.  However, it is apparent from the Prehearing Statement, Dkt. 72, and the parties' briefs that what the parties seek is not a construction of these claims, but rather the court's determination as to whether these claims are indefinite under 35 U.S.C. § 112(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**            'O'

| Case No. | CV 15-5742 CAS (PLAx) | Date | June 14, 2016 |
|---|---|---|---|
| Title | ALEXSAM, INC. V. GREEN DOT CORPORATION ET AL | | |

As stated above, the Court finds that indefiniteness arguments are better suited for a motion for summary judgment, and declines to construe these claims or rule on whether or not they are indefinite at this time. To the extent the parties wish to raise such arguments, they may do so in a motion for summary judgment.

## V.      CONCLUSION

In accordance with the foregoing, the Court concludes that (1) the limitation "encoded" is construed to mean "encoded on a magnetic strip of a card, or as a bar code on the card"; (2) the limitation "information retrieval card" is construed to mean "a card that is used to retrieve information"; (3) the limitation "purchase data" is construed to mean "data that refers to a purchase"; (4) the limitation "loyalty data" is construed to mean "data transmitted when a loyalty card is swiped through an [Patent '608: unmodified existing]/[Patent '787: pre-existing] standard retail point of sale device, comprising the unique identification number of the loyalty card and purchase data representing the purchase amount"; (5) the limitation "loyalty points" to mean "a unit of measurement earned from or relating to a loyalty card program"; (6) and "loyalty card" to mean "a card used to reward consumers, where the information regarding the consumer's loyalty account is transmitted at the point of sale in real time as a purchase takes place." The Court declines to construe the following terms: (1) "directly or indirectly"; (2) "entering"; (3) "unique identification number"; and (4) the disputed alleged means-plus-function-claims.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |